UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Fellicia Smith,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Starr, Warden; Hiller, Unit Manager; Wilson, Trust Fund; Nelson, Commissary; each being sued in their individual and official capacities; and Federal Correctional Institution, Waseca;<br><br>　　　　　Defendants. | Case No. 21-cv-2703 (SRN/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

　　　　This matter is before the Court on Plaintiff Fellicia Smith's Complaint [ECF No. 1 at 11-12] and a document entitled "Order to Show Cause for a Preliminary Injunction and a Temporary Restraining Order" [ECF No. 6]. The Court construes Smith's requests in her prayer for relief and the separate "order" as a motion for a preliminary injunction. The motion has been referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the following reasons, the Court respectfully recommends that the motion be denied.

**I.　Background**

　　　　Plaintiff Fellicia Smith has been incarcerated at the Federal Bureau of Prisons ("BOP") in Waseca, Minnesota ("FCI Waseca") since March 17, 2021. (Compl. at 2-3 [ECF No. 1].) On December 20, 2021, Smith filed the instant action challenging FCI

Waseca's religious diet program under 1) the free exercise clause of the First Amendment, 2) the establishment clause of the First Amendment, 3) the Religious Freedom Restoration Act, and 4) the Religious Land Use and Institutionalized Persons Act.

### A. FCI Waseca's Food Offerings and BOP's Religious Diet Program

FCI Waseca offers food products through three avenues: the mainline food service program, the commissary, and the special purpose order ("SPO") program. The mainline ensures that inmates "will be provided with nutritionally adequate meals, prepared and served in a manner that meets Government health and safety codes." (Lee Decl. Ex. A at 2 [ECF No. 29-1].) Meanwhile, the commissary serves as a store where inmates have the privilege to purchase merchandise and services not provided by the Bureau or of a different quality than that provided by the BOP. (Wilson Decl. ¶ 4 [ECF No. 30]; Wilson Decl. Ex. A at 1, 15 [ECF No. 30-1].) Inmates shop weekly but must stay within a monthly limit; at FCI Waseca, that limit is $360 a month, with an additional $50 in November and December. (Wilson Decl. Ex. A at 29.) The SPO program allows inmates to purchase an approved item or items not routinely sold in the commissary. (Wilson Decl. ¶ 8.) Inmates are permitted one SPO order per month, with a monthly limit of $300 per quarter. (Wilson Decl. Ex. A. at 40.) With exceptions not applicable to Smith, items purchased through SPO count against the inmate's monthly commissary spending limit. (*Id.* at 29.) All items in the commissary and offered through the SPO program are subject to a 30% markup (except during Passover) and shipping is charged to the inmate. (*Id.* at 38, 41.) Inmates may only purchase 14 shelf-stable entrees per

commissary visit and may not have more than 21 shelf-stable entrees in their possession at any time. (Wilson Decl. ¶ 7.)

The BOP has implemented a religious diet program in order "to provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and the Bureau of Prisons." (Dolsberry Decl. Ex. A at 2 [ECF No. 28-1].) The religious diet program has two components: 1) self-selection from the mainline, including a no-flesh option and access to salad when offered; or 2) religious certified processed foods. (Dolsberry Decl. ¶ 4 [ECF No. 28].) FCI Waseca does not have a significant population requesting kosher or halal shelf-stable entrees, so while the commissary sells items that could meet kosher or halal standards, it does not currently stock kosher or halal shelf-stable entrees specifically. (Wilson Decl. ¶ 16.) While the certified religious diet program historically only provided inmates with kosher prepared foods (Lee Decl. ¶ 4 [ECF No. 29]), the BOP implemented a halal component on October 3, 2021. (Dolsberry Decl. ¶ 4.)

Given the renewed interest in shelf-stable kosher and halal entrees, Trust Fund Supervisor Jacqueline Wilson contacted vendors and reviewed samples from a correctional security and safety standpoint. (Wilson Decl. ¶ 17.) Ultimately, Wilson selected a vendor that could sell kosher and halal shelf-stable entrees by the case, which contain twelve of the same meal, because the overall price was the most reasonable. (*Id.* ¶ 18.) Like other goods purchasable at the commissary or through the SPO program, the cases are sold at a 30% markup (except during Passover) with shipping charged to the

3

inmate, and credited against the inmate's spending limit.  (Wilson Decl. Ex. A at 38, 41.)  The twelve-pack of meals costs between $74.90 and $95.35 after mark-up, and shipping costs $13.95 per case.  (Wilson Decl. ¶ 18.)[1]

Whether the meals are ready to eat without cooking or reheating is disputed, and Smith complains about the inability to reheat these products.  (*Compare* Defs.' Mem. Opp. at 13 [ECF No. 26] *and* Wilson Decl. ¶ 24 (no heating necessary), *with* Pl.'s Reply at 7-8 [ECF No. 35], Lee Decl. ¶ 6 ("The meals are designed to be heated in a conventional or microwave oven . . . ."), *and* Wilson Decl. Ex. C at 1 [ECF No. 30-3] (pictures of meals advertising "Heats in Minutes" on the package).)  Although historically there were microwaves available for use by inmates, as of May 1, 2020, FCI Waseca no longer allows inmates other than those assigned to work in food service to have access to microwaves or heating implements due to the risk of fire and history of misuse.  (Wilson Decl. ¶¶ 22-24.)  Instead, inmates may use a small container[2] to collect temperature-regulated hot water.  (*Id.* ¶¶ 21, 25.)

### B.     Smith's Attempt to Participate in the Religious Diet Program

Smith alleges in her Complaint that she is religious but does not belong to a "traditional or established church."  (Compl. at 2.)  Instead, her religious beliefs remold and shift as she learns more about the religious practices and observations of others.

---

[1] Subsequent to the filing of this litigation, FCI Waseca found a vendor who sells kosher and halal shelf-stable entrees individually, which would cost $7.95 per meal, plus a 30% mark-up (except during Passover), plus shipping.  (Wilson Decl. Ex. D [ECF No. 30-4].)
[2] FCI Waseca does not provide large containers because of past misuse.  (Wilson Decl. ¶ 26.)

(*Id.* at 3.) She states that when she was transferred to FCI Waseca, she found it difficult to practice her religious dietary beliefs. She alleges that she could not find kosher or halal foods available at the commissary, and staff and other inmates said those options did not exist. (*Id.*)

In September 2021, Smith learned of the BOP's Program Statement 4500.12, which requires the provision of kosher and halal meals through the special purpose order ("SPO") program. (Compl. Ex. A [ECF No. 1-1 at 1].) Smith states that when she inquired, however, she was told she had to be designated as Jewish or Muslim to order meals through the program. (Compl. at 4.)

After the prison contracted with the vendor to supply kosher and halal foods through the SPO, Smith submitted an electronic request to be interviewed for the religious diet program on December 21, 2021. (*See* Dolsberry Decl. Ex. B [ECF No. 28-2].) Smith wrote she did not identify as Jewish or Muslim, but that she would "like to eat kosher/halal food with a few significant differences for religious reasons." (*Id.*; *see also* Compl. at 2.) FCI Waseca Chaplain Craig Dolsberry met with Smith two days later to conduct an interview to determine her religious motivations for wanting to participate in the diet program and how best to accommodate her dietary needs. (Dolsberry Decl. ¶ 9; Dolsberry Decl. Ex. A at 19.) He could not understand the precise parameters of Smith's religious dietary requests. (*Id.*) However, he understood that Smith would eat chicken, but not the skin from the bones; she would not eat veins or arteries in meat; she would not eat pork or tofu, but she could eat certain beef products; and fruits and vegetables were acceptable. (*Id.*) Smith did not explain how the certified process food program aligned

5

with her dietary restrictions. (*Id.*)[3] As a result, Chaplain Dolsberry thought there was a high risk that Smith would request to be removed from the program or eat off diet and be removed. (*Id.* ¶ 11.) When Chaplain Dolsberry spoke with Smith again in January 2022 he was unable to obtain additional information because Smith insisted on a deposition. (*Id.* ¶ 13; Pl.'s Reply at 8.) As a result, Chaplain Dolsberry did not alter his recommendation against the religious diet program.

### C. Plaintiff's Pursuit of Administrative Remedies

The BOP has a four-tiered administrative procedure for inmate grievances, codified at 28 C.F.R. § 542.10–542.19. The first step is informal resolution with prison staff. 28 C.F.R. § 542.13(a). Requests for Informal Resolution Forms (BP-8) are not assigned a Remedy ID number and are not tracked. (Boldt Decl. ¶ 7.) If the inmate is unable to informally resolve her complaint, she may file a formal Request for

---

[3] In reply briefing, Smith provided some clarifications. She listed ten of her religious diet beliefs:
    1) no oral consumption of animal milk
    2) no eating the skin of an animal
    3) no consumption of meat/flesh attached to a bone or the veins or arteries of an animal
    4) no alcohol in the processing or cooking of food
    5) only consumption of fruit in its natural state
    6) no steroids or chemicals fed to animals or in processing of foods
    7) no chemically engineered food
    8) no consumption of hooves or organs of animals
    9) no consumption of eggs (quail, ect.) or baby animals (veal, ect.)
    10) animals to be blessed before slaughtered.
(Pl.'s Reply at 5.) She also indicated that "[n]either a total Kosher/Halal diet can meet all those religious dietary beliefs while I am in prison. I am trying to compromise by eating some items through self-selection at mainline and hopefully through purchasing Kosher/Halal meals at a reasonable price. (*Id.* at 5-6.)

Administrative Remedy (BP-9) at the incarceration institution. 28 C.F.R. § 542.14. If the inmate feels the response to her BP-9 is inadequate, she may appeal to the Regional Director within 20 calendar days of the signed response by filing a Regional Office Administrative Remedy Appeal (BP-10). 28 C.F.R. § 542.15(a). Finally, if still dissatisfied, the inmate may appeal to the General Counsel, by filing a Central Office Administrative Remedy Appeal (BP-11.) *Id.* An inmate may not raise in an appeal an issue she did not raise in a lower level filing. 28 C.F.R. § 542.15(b)(2).

Smith filed an informal resolution attempt (BP-8) on September 8, 2021, complaining about the lack of food to meet her religious dietary needs. (Compl. Ex. B [ECF No. 1-1 at 2].) After the changes to the availability of kosher and halal meals, Unit Manager Hiller responded to Smith's grievance on November 4, 2021, indicating Smith could purchase meals through the SPO program. (Compl. Exs. B-C [ECF No. 1-1 at 2-3].) On November 9, 2021, Smith filed a Request for Administrative Remedy (BP-9) No. 1100942-F1 taking issue with the need to purchase a case of one type of meal, some of which required heating which was not available. (Boldt Decl. Ex. C at 2 [ECF No. 27-3].) On December 20, 2021, the warden responded, explaining among other things that the vendor could only process orders by the case and that each meal was fully cooked, shelf stable, and consumable without reheating. (*Id.* at 1.) After an initial appeal was procedurally rejected as premature, Smith filed a Regional Office Administrative Remedy Appeal (BP-10) No. 1100942-R2 on December 23, 2021, arguing it was unreasonable to require her to purchase a case for a price over $95 and that she cannot be forced to eat from the mainline. (Boldt Decl. Ex. D at 2 [ECF No. 27-4].) The Regional

7

Director responded, indicating FCI Waseca was following policy by making meals available through the SPO program. (*Id.* at 1.) Smith states in her reply memorandum in support of this motion that "I have continued on with the administrative remedy process and it is at the national level." (Pl.'s Reply at 3.)

The Court is unaware of any subsequent developments in the administrative review process.

### D. Plaintiff's Requests for Preliminary Relief

Smith's Complaint included a prayer for relief in the form of a

> preliminary and permanent injunction ordering Defendants Starr, Hiller, Nelson and Wilson to cease forcing me to purchase a case (12) of meals at once at $95.35 or meals individually at more than $3, to process all SPO orders weekly as all commissary food orders are, to sale a water jug or heating element to cook the meals (whichever is quicker to get to myself and other inmates), and to comply with all BOP policies involved in selling Kosher/Halal meals . . . and to put the meal selections on the commissary list and on the bulletin board[.]

(Compl. at 11-12.) Smith simultaneously filed a document entitled "Order to Show Cause for a Preliminary Injunction and a Temporary Restraining Order," which the Court construes as a motion for a preliminary injunction in the form of a proposed order. [ECF No. 6]; *see Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1030 (D. Minn. Jan. 21, 2010) (same). Smith repeated her requests for a preliminary injunction as previously described and

8

added that purchasing kosher or halal meals should not count against an inmate's spending limit. [ECF No. 6 at 1.]

## II. Discussion

### A. Standard of Review

Injunctive relief is an extraordinary remedy, and the movant bears the burden of establishing the propriety of an injunction. *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The question is whether the "balance of the equities so favors the movant that justice requires the court to intervene *to preserve the status quo* until the merits are determined." *Id.* (emphasis added). Courts consider four factors in determining whether an injunction should issue: (1) the likelihood of the movant's ultimate success on the merits, (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief may cause the non-moving party; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113-14 (8th Cir. 1981) (en banc). "While no single factor is determinative, the probability of success factor is the most significant," *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013), and "an injunction cannot issue if there is no chance of success on the merits," *Mid-America Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). "The absence of a likelihood of success on the merits strongly suggests that

9

preliminary injunctive relief should be denied." *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).

### B. Analysis

#### 1. Failure to Exhaust Administrative Remedies Bars Preliminary Injunctive Relief

All of Smith's claims are subject to the Prison Litigation Reform Act of 1995 ("PLRA"), which provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Finally, exhaustion of administrative remedies is required for any suit challenging prison conditions, not just for suits under § 1983.") (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). The PLRA requires that inmates fully and properly exhaust their available administrative remedies as to each claim in the complaint *prior to the filing of an action in federal court*. *Id.* at 93; *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003); *see also Muhammed v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019). Although failure to exhaust is an affirmative defense that the defendant has the burden to plead and to prove, *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005), the Court must consider at the preliminary injunction stage whether defendants are likely to succeed in establishing this defense. *See Gonzalez v. O Centro Espirita Benificente Uniao do Vegetal*, 546 U.S. 418, 428-29

(2006). Ultimately, there is no likelihood of success on the merits of an unexhausted claim.

The administrative remedy process must be followed from start to finish. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). However, "[u]nder the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "The availability of a remedy, according to the Supreme Court, is about more than just whether an administrative procedure is 'on the books.'" *Townsend v. Murphy*, 898 F.3d 780, 783 (8th Cir. 2018). The Supreme Court has recognized at least three circumstances where an administrative remedy is not capable of use:

> (1) where it operates as a simple dead end—with officers unable or consistently unwilling to provide *any* relief to aggrieved inmates;
> (2) where the administrative scheme is so opaque as to be practically incapable of use; and
> (3) where administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Muhammed*, 933 F.3d at 1000 (cleaned up) (quoting *Ross v. Blake,* 136 S. Ct. at 1858).

As already noted, the BOP has a four-tiered administrative procedure for inmate grievances, codified at 28 C.F.R. § 542.10–542.19. The first step is informal resolution with prison staff. If the inmate is unable to informally resolve her complaint, she may file a formal Request for Administrative Remedy (BP-9) where she is incarcerated. If she feels the response to her BP-9 is inadequate, she may appeal to the Regional Director by filing a Regional Office Administrative Remedy Appeal (BP-10). And finally, if still dissatisfied, the inmate may appeal to the General Counsel by filing a Central Office Administrative Remedy Appeal (BP-11). Not until there is a decision by the Central

Office is the process considered complete. *See Bailey v. Fisher*, Case No. 12-cv-1727 (DWF/LIB), 2012 WL 7181907, at *2 (D. Minn. Dec. 27, 2012). And overlying the entire process is the provision that the inmate may not raise an issue on appeal that she did not first raise in a lower level filing.

Here, the Court cannot find that Smith has a likelihood of success on the merits of her case because she had not properly exhausted any of her claims before she filed her Complaint. First, to the best of the Court's knowledge, Smith still has not received a response from the Central Office, which means the process is incomplete as to all claims. Second, even if the Central Office responds to Smith during the pendency of this lawsuit, the process was not complete at the time Smith filed her complaint, as required by the PLRA. *Johnson*, 340 F.3d at 627-28. And finally, Smith's complaints shifted throughout the administrative appeal process, in contravention of 28 C.F.R. § 542.15(b)(2), which means Smith did not properly exhaust any claim that she raised for the first time after her request for informal resolution, or any claim that she abandoned in subsequent appeals.[4]

Smith argues that because Hiller took 56 days to respond to her request for informal resolution instead of the ordinary 15 days, "defendants negated the use of the process in which responses are to be handed back in a timely manner . . . . If the defendants do not have to follow procedures as written they cannot force inmates to do so." (Pl.'s Reply at 3.) Smith suggests that since the administrative process is ordinarily

---

[4] Although Smith has filed twenty formal requests for administrative remedy (Boldt Decl. Ex. B.), the Court is unaware of any concerning the issues before the Court other than Request No. 1100942.

12

completed in 105 days and she filed her complaint 104 days after filing her request for informal resolution, the Court should treat the administrative process as having been exhausted, or the equivalent thereof, by the time Smith filed her Complaint. (*Id.*).

But contrary to Smith's arguments, the regulations do not prescribe a time to respond to requests for informal resolution. *See* 28 C.F.R. § 542.18; *see also Porter*, 534 U.S. at 523-24 (describing Congress's removal of "plain, *speedy*, and effective" requirements for administrative procedures). Furthermore, although there are instances in which inmates have not been held to the exhaustion requirement of the PLRA because prison officials have actively prevented them from exhausting their administrative remedies, *see, e.g.*, *Foulk v. Charrier*, 262 F.3d 687, 697-98 (8th Cir. 2001), this is not such a case. In *Foulk,* the plaintiff could not file a formal administrative grievance because prison officials never responded to plaintiff's attempts at informal resolution. Here, however, prison officials did respond, even if not as quickly as Smith would have liked, and Smith has been able to proceed through the formal process. *See Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015) (holding plaintiff failed to exhaust administrative remedies despite unjustified delay by prison officials because the officials' non-compliance did not cause the remedies to be unavailable and plaintiff was able to file a grievance and receive a response); *see also Sergent v. Norris*, 330 F.3d 1084, 1086 (8th Cir. 2003) (similar). Moreover, the delay here was ostensibly due to the time required to locate and vet a vendor and expand the religious processed foods offered through SPO. It would be antithetical to the purpose of the PLRA to waive compliance with the administrative exhaustion requirement because of reasonable delay by officials who are

13

actively working to address complaints about its program. *See Jones*, 549 U.S. at 219 ("We have identified the benefits of exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit, . . . ."); *Porter*, 534 U.S. at 524-25 (stating the PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits . . . afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case").

Because the Defendants have shown that Smith failed to properly exhaust her administrative remedies, Smith is unlikely to be successful on the merits. Accordingly, the Court need not analyze the likelihood of success on the merits of Smith's substantive claims.

### 2. Other Factors Caution Against Preliminary Relief

Defendants argue the Court need not review the other *Dataphase* factors—irreparable harm, the balance of the harm to the movant if the motion is denied against the harm to the non-movant if the motion is granted, and the public interest—because Smith has not established a likelihood of success on the merits. (Defs.' Mem. Opp. at 29.) While likelihood of success is sometimes considered a threshold factor, *see Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 & n.5 (8th Cir. 2008) (en banc), the Court considers the other factors briefly for purposes of this report and recommendation.

The Court finds the balance of equities supports denying the motion for preliminary injunction. In so finding, the Court recognizes that a "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Smith seeks a preliminary injunction to abate those alleged on-going violations pending final resolution of her case on the merits. But the public interest—as represented by the PLRA—favors administrative resolution and exhaustion over judicial intervention in the prison context. *See* 42 U.S.C. § 1997e(a); 18 U.S.C. § 3626(a)(2). Moreover, it is clear the religious diet program at FCI Waseca is currently evolving, meaning at least some of Smith's complaints have become or are likely to become moot. *See Forbes v. Ark. Educ. Tele. Comm. Net. Found.*, 982 F.2d 289, 289 (8th Cir. 1992) (per curiam) (request is moot if relief would no longer have meaning for the party seeking it); *Frazier v. Kelley*, 460 F. Supp. 3d 799, 836 (E.D. Ark. 2020) (denying injunctive relief where defendants have already put policies and practices in place). On the whole, therefore, the remaining *Dataphase* factors do not weigh in favor of granting Plaintiff's motion for a preliminary injunction in this case even if the likelihood of success assessment were different.

### III. Recommendation

For the foregoing reasons, it is respectfully recommended that Plaintiff's request for preliminary relief in her Complaint [ECF No. 1] and in Plaintiff's Order for a Preliminary Injunction and a Temporary Restraining Order [ECF No. 6] be denied.

Dated: March 7, 2022

*s/ Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).